M.B. INVESTMENTS, A Pennsylvania General Partnership, and Vaughn Spencer, Michael Schorn, Angel Figueroa, and Dennis Sterner, in their capacities as City Council Members and Taxpayers of the City of Reading, Appellants

v.

Thomas W. McMAHON, Mayor of the City of Reading and Jeffrey Waltman, Marcia Goodman–Hinnershitz, and Donna Reed.

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 30, 2006.

Decided July 28, 2006.

William F. Fox, Jr., Audubon and Andrew J. Giorgione, Harrisburg, for appellants.

LeRoy G. Levan, Shillington, for appellee, Thomas M. McMahon.

Stephen V. Yarnell, Narberth, for appellees, Jeffrey Waltman, Marcia Goodman–Hinnershitz and Donna Reed.

BEFORE: PELLEGRINI, Judge, and LEAVITT, Judge, and KELLEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

M.B. Investments (MB), along with Vaughn Spencer, Michael Schorn, Angel Figueroa and Dennis Sterner, appeal from an order of the Court of Common Pleas of Berks County (trial court) denying their motion for peremptory judgment in mandamus because the Option Agreement passed by Resolution No. 109–2005 involving the sale or conveyance of land was required to be passed by ordinance subject to Mayor Thomas W. McMahon's (Mayor McMahon) veto.[1]

The City of Reading (City) has owned approximately 560 acres of largely undeveloped land in Lower Alsace Township, Berks County (Antietam Lake Property) for more than a century. Most recently, the Antietam Lake Property has served as an open space recreational area but is in need of substantial and costly repairs and improvements. For financial and other reasons, the City considered MB's proposal for a private-public partnership with respect to the Antietam Lake Property. On June 13, 2005, Reading City Council (City Council) approved Resolution No. 54–2005 by a vote of four to three authorizing City Council, through a negotiating team, to conclude final negotiations and prepare for execution of an Option Agreement to implement the private-public partnership between MB and the City.

On November 28, 2005, City Council passed Resolution No. 109–2005 in a vote of four to three[2] to approve a final Option Agreement between MB and the City. The Option Agreement allowed MB to purchase an irrevocable option for the Antietam Lake Property for $2,500,000, and required MB to provide approximately $3,000,000 in dam repairs; $500,000 in infrastructure improvements; and $2,000,000 in property operation and maintenance payments. A restrictive conservation easement prohibited development on the Antietam Lake Property unrelated to operation or maintenance for a period of 20 years in order to preserve its use as an open space recreational area. Pursuant to the Option Agreement, MB had the right to exercise its option[3] at any time prior to the end of a 20–year period by giving written notice and paying consideration of

1. Section 221 of the Home Rule Charter (Charter) provides:

1. Before any ordinance takes effect it must first be submitted to the Mayor for approval. The Mayor shall sign the ordinance within 10 days, if approved, but if not, shall return it to Council stating objections. Council shall at its next meeting, reconsider the ordinance and may pass it over the Mayor's veto by the affirmative vote of five members of City Council.

2. City Council members Vaughn Spencer, Michael Schorn, Angel Figueroa and Dennis Sterner voted in favor of the Option Agreement, while City Council members Jeffrey Waltman, Marcia Goodman–Hinnershitz and Donna Reed voted against the Option Agreement.

3. Paragraph 5 of the Option Agreement provides:

... If MB shall exercise its Option during the Option Term, this Option Agreement shall, on the "Option Exercise Date", become a contract for the purchase and sale of the Antietam Lake Property. The consideration for the conveyance ... to MB shall be the sum of One Dollar ($1.00) and it shall be payable by MB to the City at the time the conveyance is made.
(Reproduced Record at 77a.)

$1.00, at which point the City would adopt an ordinance authorizing the conveyance of the Antietam Lake Property to MB and the City as tenants in common.[4] Because it was a resolution, it was not sent to Mayor McMahon for his consideration.

On November 29, 2005, MB executed the Option Agreement and it was presented to Mayor McMahon for his signature. Mayor McMahon refused to sign because the Option Agreement violated the Administrative Code of the City (Code) as well as the Charter because it was a conveyance of an interest in land that required approval by a City ordinance. As a result, the Option Agreement was not consummated. Pursuant to Resolution No. 109–2005, MB and four City Council members[5] sought a mandamus order and motion for peremptory judgment to compel Mayor McMahon to execute the Option Agreement on behalf of the City. Finding that the Option Agreement constituted an agreement of sale or conveyance of property, and that an ordinance was the only proper way to sell or convey City property, the trial court denied the motion for peremptory mandamus judgment by order dated December 30, 2005. MB filed an appeal, which this Court dismissed *sua sponte* because the order was not appealable. MB then filed a motion to have the December 30, 2005 order considered a final appealable order which the trial court granted. This appeal followed.[6]

4. Paragraph 26 of the Option Agreement provides:
> 26. *FAILURE OF CITY TO COVEY [sic] PROPERTY UPON EXERCISE OF OPTION:* If MB exercises the Option provided for in Paragraph no. 2 [grant of option to purchase] of the Agreement, the City Council of the City of Reading under the current requirements of the City Home Rule Charter and Administrative Code will be required to adopt an Ordinance authorizing the conveyance to MB of a Tenancy in Common ownership interest in the Antietam Lake Property as provided for in this Agreement. If for any reason the City Council fails or refuses to adopt or enact the necessary Ordinance or if the Mayor vetoes that Ordinance or fails or refuses to execute the necessary Deed of Conveyance and the situation is not cured within ninety (90) days of MB providing a written cure notice to the City, then the City shall:
> (a) Repay MB the Option Payment made by MB under Paragraph 3(a) of this Agreement together with interest compounded annually from the date that MB made the Option Payment to the City,
> (b) Repay MB all monies expended on the Dam Project under Paragraph 3(c) of this Agreement together with interest compounded annually from the date that the Dam Project was commenced, and
> (c) Repay MB for all infrastructure improvements made or paid by MB in connection with the Antietam Lake Property and facilities including, but not limited to, the infrastructure improvements provided for in Paragraph 3(b) of this Agreement together with interest compounded annually from the date the infrastructure payments were made or paid by MB.
> (d) Pay MB the reasonable costs for its professional and management services rendered and for time expended by MB in connection with the Antietam Lake Property together with interest compounded annually from the date the services were rendered.
> The City shall repay such funds in (i) installment payments of one million five hundred thousand dollars ($1,500,000) per year, payable on January 15th of each year, until satisfied at an interest rate of the published Wall Street Journal prime rate plus three percent (3%) calculated from the date identified above or (ii) the full amount upon sale of the Antietam Lake Property to a third party, whichever is sooner.
> (Reproduced Record at 89a–90a.)

5. For purposes of this opinion, we will refer to MB and the four City Council members that voted in favor of the Option Agreement as MB for the remainder of this opinion.

6. Our scope of review in a mandamus action is to determine whether the trial court abused its discretion or committed an error of law and whether sufficient evidence exists to support its findings. *Philomeno & Salamone v.*

The question in this case is, under the Charter and the Code, whether City Council's action in approving the resolution authorizing the Option Agreement regarding Antietam Lake Property with MB and whether Mayor McMahon had a ministerial duty to sign that Option Agreement. Under Section 1–121 of the Code,[7] City Council is clearly permitted to take action by ordinance, resolution or motion;[8] however, Section 1–122 of the Code prescribes certain actions that must be taken by ordinance. It provides in pertinent part:

> 1. **Action Requiring an Ordinance.** In addition to requirements provided by law or the Charter, §§ 215 through 224, acts of the Council *shall be by ordinance* which:
>
> \* \* \*
>
> G. Adopt procedures for purchasing of products, goods, or services, for the making of contracts and for the sale or lease of personal or real property of the City.
>
> \* \* \*
>
> J. Purchase, convey or lease lands or buildings.

Under Section 308(A) of the Charter, the Mayor shall "[e]xecute, enforce, and obey the ordinances of the City and laws of the Commonwealth of Pennsylvania and the United States of America" and under Section 308(K) to "[e]xecute all bonds, notes, contracts and written obligations of the City."

MB contends that the trial court erred in denying mandamus relief[9] compelling Mayor McMahon to sign the Option Agreement that was approved for execution by Resolution No. 109–2005. It argues that the Option Agreement relating to the Antietam Lake Property is not an agreement of sale or conveyance of land requiring City Council's approval by the adoption of an ordinance, but rather a "normal" contract that can be conveyed by City Council by resolution, not subject to any action by the Mayor. Because it is a "normal" contract, MB argues that because the Mayor is only mandated under Section 308(K) to "[e]xecute all bonds, notes, contracts and written obligations of the City" once authorized by City Council, he has a ministerial duty to execute the Option Agreement. See *Symon v. Tomljanovic*, 71 Pa.Cmwlth. 205, 454 A.2d 234 (1983).

In *Guido v. Township of Sandy*, 584 Pa. 93, 880 A.2d 1220, 1225 (2005), however,

---

*Board of Supervisors of Upper Merion Township,* 882 A.2d 1044 (Pa.Cmwlth.2005).

7. Section 1–121 of the Code provides:
    Official actions of the Council shall be taken by ordinance, resolution or motion, as provided in the Charter. An ordinance is defined as law, a rule made by authority or decree, while a resolution is policy or an expression of opinion.

8. Section 224 of the Charter provides "[n]othing ... is intended to preclude Council from taking appropriate action by resolution or motion."

9. Mandamus is an extraordinary writ and remedy used to compel performance of a ministerial act or mandatory duty. *Council of the*

*City of Philadelphia v. Street,* 856 A.2d 893 (Pa.Cmwlth.2004). A ministerial act is defined as one which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, and without regard to his own judgment or opinion concerning the propriety or impropriety of the act to be performed. *Id.* In order to obtain a writ of mandamus, the proponent must demonstrate: 1) a clear legal right for the performance of the ministerial act or mandatory duty; 2) a corresponding duty in the appellant to perform the ministerial act or mandatory duty; and 3) the absence of any other appropriate or adequate remedy. *Id.*

our Supreme Court noted that an option agreement for the sale of land is an equitable conveyance of land, stating:

> In *Detwiler v. Capone* we discussed the rights conferred by a lease containing a purchase option.
>
> > An option to purchase is analogous to a contract for the sale of land; it is in nature an encumbrance on the land pledged. In such case, the [optionor] is a trustee of the legal title for the benefit of the purchaser [qua optionee].... Equity regards the person bound to convey as having done what he should have done, i.e. made the conveyance, and treats him as trustee for the optionee. Where an option is exercised the title of the optionee relates back to the date of the option and his interest is regarded as real estate of that time....

357 Pa. 495, 357 Pa. 495, 55 A.2d 380, 383 (1947) (internal quotation marks and citations omitted); *see In re Powell,* 385 Pa. 467, 123 A.2d 650, 654 (1956) ("An option to purchase land is a substantial interest in the land; and, when the option is exercised, the optionee's ownership reverts to the granting of the option ...."); *cf. Chelan County v. Wilson,* 49 Wash.App. 628, 744 P.2d 1106, 1109 (1987) (noting that even where issues regarding regulatory compliance inhere in a transaction conveying land, the vendee of property has a valid and subsisting interest therein). We also observed in *Detwiler* that "the landlord-tenant relationship between the parties ceased to exist upon verbal communication of plaintiffs' election [to exercise the option] and the lease was converted into a contract of sale." 55 A.2d at 384. This ruling reflects an historic account of the legal effect of the exercise of an option to purchase, the import of which brooks no misunderstanding. Thus, in *People's Street–Railway Co. v. Spencer,* 156 Pa. 85, 27 A. 113 (1893), we wrote:

> It was held in [*Kerr v. Day,* 14 Pa. 112 (1850) ], that an option to purchase is a substantial interest in land, which may be conveyed to a vendee; and the English chancery cases were reviewed by Bell, J., with the result that, 'when the lessee made his option to purchase, he was to be considered as the owner ab initio. Indeed, the determination can only be supported by attributing to the lessee an equitable estate in the land, under his covenant for an optional purchase, which passed to his alienee, vesting him with the right to call for a specific execution on declaring his election.' And in [*Frick's Appeal,* 101 Pa. 485 (1882) ], where the land was sold upon a prior judgment before payment or conveyance, it was held that the surplus was the property of the optional vendee.

*Id.* at 114, 880 A.2d 1220.

While the Supreme Court in Sandy held that a "normal" option agreement for the sale of a substantial interest in the land would alone require an ordinance to authorize its execution, the Option Agreement here goes much further in effectuating the sale of land than what would be considered a normal option agreement. Under the Option Agreement, the City would have taken all steps necessary to convey an ownership interest in the Antietam Lake Property to MB, and MB would have had the sole power to complete the conveyance by exercising its option that would have transferred title. Moreover, the front-loaded amount paid for the option rights, the nominal amount of consideration to exercise the option, and the default and buyback provisions, all pointed to the conclusion that the Option Agreement was a de facto sale of the Antietam Lake Property.

Because the Option Agreement was a de facto sale of the Antietam Lake Property and was not approved by a City ordinance as required, the trial court properly determined that MB had not shown that there was a clear legal right to have the Option Agreement executed by Mayor McMahon. Accordingly, the order of the trial court is affirmed.

### ORDER

AND NOW, this *28th* day of *July,* 2006, the order of the Court of Common Pleas of Berks County, dated February 15, 2006, is affirmed.